1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                           EASTERN DISTRICT OF CALIFORNIA

10

11    ANGELICA MATA RAMIREZ,                    No. 2:17-cv-02379-MCE-AC

12                  Plaintiff,

13          v.                                  **MEMORANDUM AND ORDER**

14    WELLS FARGO BANK, N.A. and
      DOES 1 through 50, inclusive,
15
                      Defendants.
16

17

18          Through the present lawsuit, Plaintiff Angelica Mata Ramirez ("Plaintiff") seeks

19    damages from her former employer, Defendant Wells Fargo Bank, N.A. ("Defendant" or

20    "Wells Fargo") for using her name and identifying features on four mailers she alleges

21    were sent to Wells Fargo customers after Plaintiff had resigned from her position as a

22    Home Mortgage Consultant in August 2017.  Plaintiff's operative complaint includes a

23    total of five causes of action seeking damages for statutory and common law invasion of

24    privacy, intentional and negligent interference with prospective economic advantage,

25    and unfair competition.

26          Now before the Court is Wells Fargo's Motion for Summary Judgment, or,

27    alternatively, for summary adjudication as to the various specific claims pled by Plaintiff.

28    In opposition to Defendant's Motion, however, Plaintiff indicates she is withdrawing her

                                               1

Third, Fourth and Fifth Causes of Action,[1] which leaves outstanding only the first and second claims for privacy violations. As set forth below, Wells Fargo's Motion as to those remaining claims is GRANTED.[2]

**BACKGROUND**

Plaintiff worked as a Home Mortgage Consultant ("HMC") in Wells Fargo's Woodland, California, branch office between 2007 and 2017, a period of approximately ten years. As an HMC, Plaintiff's job was to provide and facilitate conventional, residential first mortgage loans with Wells Fargo. On August 25, 2017, she voluntarily resigned without prior notice to take a position with another mortgage company.

Plaintiff's suit against Wells Fargo is based on the allegation that the company improperly sent four different mailers to customers following her resignation, using Plaintiff's name and identifying information, in order to continue to solicit business from customers. Plaintiff claims that using her personal data in that matter violated her privacy rights and that she suffered damages as a result. Def.'s Stmt. Of Undisputed Fact ("SUF") No. 1.[3]

During Plaintiff's tenure as an HMC with Wells Fargo, she participated in regular marketing campaigns. Those programs were intended to promote Plaintiff's visibility with potential customers, generate refinance opportunities for existing clientele, and increase Plaintiff's overall book of business. One such program, tailored specifically for HMCs, was known as FastMail. Under FastMail, HMCs like Plaintiff were able to have

---

[1] Given Plaintiff's abandonment of those claims, they need not be further considered in this Memorandum and Order.

[2] Having determined that oral argument would not be of material assistance, the Court submitted this matter on the briefs in accordance with E.D. Local Rule 230(g).

[3] Wells Fargo's Motion was originally premised on a total of five allegedly unauthorized, post-resignation mailers, but Plaintiff's responses to Defendant's Statement of Undisputed Fact show that in fact only four mailers are at issue. See Pl.'s Response to SUF, ECF No. 12, Nos. 2, 4, 11, 14.

Wells Fargo generate marketing mailers personalized with their contact information. Those mailers would be sent to customers within an HMC's book of business at a regular schedule throughout the year.

One of the mailers at issue in this lawsuit is an annual mortgage check-up direct mail postcard ("AMC postcard") generated under the FastMail program. That postcard was mailed on or about September 6, 2017, or about two weeks after Plaintiff's employment with Wells Fargo ended. See Clark Dep., 53:10-54:15; Clark Decl., ¶ 4.[4]

Wells Fargo has produced evidence that Plaintiff subscribed to the optional FastMail program in July 2011 and remained enrolled until she resigned on August 25, 2017. Pl. Dep., 46:11-15, 86:24-87:13. Decl. of Jenny L. Clark, ¶ 2. Plaintiff paid a monthly fee to participate in the program. She chose to personalize her FastMail correspondence with her Nationwide Mortgage System & Registry ("NMLSR") identification numbers, as well as her office address, direct office number, cell phone number, website address, and email address. Pl.'s Dep., 158:7-14. Moreover, by signing up for FastMail, it is undisputed that Plaintiff agreed to abide by the program's terms and conditions while employed. SUF No. 8. She understood that those conditions included the fact that future mailers would stop, along with her obligation to pay for the FastMail service, only if she withdrew from the program before a specified cut-off date. Pl.'s Dep., 52:2-53:15; 92:1-4. After that date mailers already in progress would be sent out because, according to Wells Fargo, the automatic process generating those mailers had already begun and could not feasibly be stopped thereafter without significantly increasing both the costs and the potential for errors like mismatched data. Clark Decl., ¶ 6. Given the multiple steps involved in generating the mailers, the lead time involved in the process was approximately five weeks. Id.

It is undisputed that the process for generating the AMC postcard at issue here started on August 6, 2017, when Plaintiff was still an employee and while she was still

[4] Excerpts of pertinent portions of the depositions of both Plaintiff and Jennifer Clark were attached as Exhibit A to the Declaration of Alexander Nestor, ECF No. 9-3. In addition, Plaintiff attached portions of her deposition to the Declaration of Anthony M. Ontiveros, ECF No. 15.

enrolled in the FastMail program.[5]  SUF Nos. 6, 7.  For the reasons stated above, Wells

Fargo claims it could not reasonably stop that process once it started, even though the

mailers ultimately went out on September 6, 2017, after Plaintiff had separated from

employment.  Clark Decl., ¶¶ 4, 6. Plaintiff contends in response that she knew of "no

reason" why the process could not be interrupted if an employee actually separated from

employment, with her understanding of the cut-off date as primarily relating to the

obligation to pay for planned mailers.  Pl.'s Decl., ¶¶ 8-9.  According to Plaintiff, Wells

Fargo had sophisticated computer systems that should have made it possible to interrupt

the process as necessary.  Id. at ¶ 9.  Plaintiff presents no evidence for that proposition

beyond her own understanding based on using the software, however, and her belief

that Wells Fargo typically cut off all systems access for terminated employees.  Id. at

¶¶ 9, 11.

The other three mailers at issue were part of a Wells Fargo marketing group

campaign not related to FastMail.  Direct mailers sent out under marketing auspices

were more generic than Fast Mail, typically employing just the HMC's NMLSR

identification number and office phone number and not a cell phone number or office

address.  Pl.'s Dep., 162:21-163:11.  Wells Fargo engaged in various marketing

campaigns throughout Plaintiff's employment that included sending out such mailers to

both existing home loan and mortgage customers, and prospective clients.  Pl.'s Dep.

45:15-24, 96:11-97:8.  HMCs like Plaintiff did not have to sign up for those campaigns or

pay any fee to be included, even though mailers associated with a particular HMC were

personalized with the HMC's basic contact information.  Plaintiff admits, however, that

Wells Fargo's marketing group posted information about its ongoing campaigns so that

HMCs could familiarize themselves with specifics concerning a given campaign, like

when mailers would go out and which customers and prospective customers would

receive them, among other information.  Id. at 50:16-51:16; 104:2-105:6.  Like FastMail,

---

[5] Plaintiff concedes she took no steps to disenroll from the FastMail before she resigned on August 25, 2017.  SUF No. 9.  She was subsequently disenrolled by Wells Fargo from the program on August 29, 2017.  Clark Decl., ¶ 3.

the standard mailing process for direct mailers, which included the time for materials to be both generated, prepared, printed and mailed, was approximately five weeks. Clark Dep., 26:20-27:21. Because, like FastMail, multiple steps are involved in an automated system, Wells Fargo maintains it cannot remove personalized information once the process starts. Clark Dep., 35:5-23; 39:18-42:9. Information contained in direct mailers consequently cannot be changed or removed, even if an HMC's employment terminates during the process.

Three mailings made by Wells Fargo's marketing group are at issue in this litigation. First, beginning in 2015 and continuing through 2017, Wells Fargo initiated a program called "Your Home Matters" ("YHM") for home mortgage customers. Pl.'s Dep., 148:20-152:2. Like other direct mailers, the YHM correspondence went through the standard approximately five-week, process from being generated to being mailed. Clark Dep., 43:5-45:1; 26:20-27:21.

In addition to the YHM mailer, the marketing group also ran a Traditional Refinance ("TR") campaign which began with direct mailers sent beginning on August 14, 2017 and concluding on August 23, 2017. Those mailings were personalized with the HMC's contact information. Clark Decl., ¶ 7. Plaintiff admits she was aware of the August 2017 TR campaign and was employed when the direct mailers went out. SUF No. 12. The campaign was a two-step process: it also included a postcard automatically sent approximately four weeks after the direct mailer as a follow up. Pl.'s Dep., 102:16-21. The follow-up postcard at issue, then, would not have gone out until mid-September 2017, after Plaintiff's employment with Wells Fargo ended.

Plaintiff notified Wells Fargo that she was resigning on August 25, 2017 and her resignation was effective that same day. Pl.'s Dep., 121:20-122:7; 125:18-126:15. Plaintiff was disenrolled from the FastMail program on August 29, 2017, four days after she resigned. Plaintiff admits she did not tell anyone at Wells Fargo prior to her resignation that she wanted either FastMail mailers, or mailers generated by

///

5

Wells Fargo's marketing group, to cease.  Pl.'s Dep., 90:24-91:3; 126:13-18, 126:23-127:3; 127:16-20.

According to Plaintiff, however, at the end of September 2017, she began receiving calls from clients who said they had just received mailings concerning loan opportunities with Wells Fargo that contained her personal information.[6]  Plaintiff claims those calls continued in October 2017.  Plaintiff alleges that the mailings made it appear she was still working for Wells Fargo and claims that because Wells Fargo had sent out mailers after her termination that continued to use Plaintiff's contact information, she "ended up paying thousands of dollars for advertising to inform people in [her] community about the change in her employment and contact information."  Pl. Decl. ¶ 18.

Although Plaintiff admitted that she never contacted anyone at Wells Fargo about why customers may have received mailers personalized with her information or whether any such mailers were sent before or after she resigned (Pl.'s Dep., 184:21-185:23; 186:14-187:5), she proceeded to file the present lawsuit in state court on October 10, 2017.  Citing diversity of citizenship under 28 U.S.C. §§ 1332 and 1441(b), the matter was subsequently removed to this Court on November 13, 2017.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  <u>Celotex</u>, 477 U.S. at 325.

///

_____

[6] Plaintiff had agreed at the commencement of her employment with Wells Fargo that she would not solicit the customers contained in her Book of Business if she left Wells Fargo.

6

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).  The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. at 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

Plaintiff's First Cause of Action asserts an invasion of privacy claim for violation of California Civil Code § 3344. To prevail on a statutory claim under Section 3344, a plaintiff must first establish the rights attendant to an invasion of privacy as recognized under the common law: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." Perkins v. LinkedIn Corp., 53 F. Supp. 3d 1222, 1242 (N.D. Cal. 2014) (citing Downing v. Abercrombie & Fitch,

265 F.3d 994, 1001 (9th Cir. 2001).  In addition, Section 3344 also requires that a plaintiff allege "(5) 'a knowing use by the defendant'; and (6) 'a direct connection between the alleged use and the commercial purpose.'"  Id.  Not surprisingly, since Section 3344 borrows from the protections accorded to privacy under the common law, Plaintiff's common law claim as set forth in her Second Cause of Action is subject to a similar analysis since the two claims share the same basic essential elements.  Id.

Wells Fargo maintains that both of Plaintiff's privacy claims necessarily fail because the evidence shows that she consented to all four mailers at issue before she resigned on August 25, 2017.  First, with respect to the FastMail AMC postcard, it is undisputed that Plaintiff had been enrolled in the FastMail program since 2011 and knew mailers already in process would be sent unless she disenrolled.  Because Plaintiff took no steps to withdraw from the program before her resignation, and because the mailing process had started beforehand on August 7, 2017, the Court concludes Wells Fargo had Plaintiff's consent and authorization to process the mailer even though it ultimately went out to customers on September 6, 2017, approximately two weeks after she resigned.

Plaintiff's attempt to argue that Wells Fargo could and should have stopped any mailers from going out after her termination is not persuasive.  Plaintiff states only that she had "no reason to think" that the process could not be stopped and contends there was also "no reason" that Wells Fargo's sophisticated computer systems should have permitted that to happen.[7]  See Pl.'s Decl., ¶¶ 9, 11.  Plaintiff cites no evidence to support her "understanding" in that regard,[8] however, and unsupported speculation on her part is not enough to create a triable issue of fact precluding summary judgment.

---

[7] With respect to other HMCs who had left Wells Fargo's employ, Plaintiff also testified it "never occurred" to her that Wells Fargo would not have procedures in place to stop mail from going out to clients in the names of those former employees.  Pl's Decl., ¶ 11.  Plaintiff nonetheless offers no specifics beyond that speculation.

[8] Federal Rule of Evidence 602 requires that any such understanding be supported by a factual basis reflecting Plaintiff's personal knowledge.

See Burch v. Regents of University of California, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("Statements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not facts and likewise will not be considered on a motion for summary judgment.").

Wells Fargo, for its part, has provided detailed testimony as to why alterations to its automated mailing processes would have been impracticable.[9]  Moreover, while Plaintiff appears to claim that mailers sent after she left Wells Fargo differed in terms of personalization from those generated beforehand (with the inference that Wells Fargo had the ability to change anything about the mailers that it wished), that argument also fails since the evidence shows that mailers sent both before and after Plaintiff's termination had individual differences, with no indication of any marked change in pattern after Plaintiff left Defendant's employ.[10]  Therefore Plaintiff's claim that Wells Fargo "was purposely designing flyers to look like they came from the HMCs personally" when this was not the case would appear to lack merit.  See Pl.'s Opp., 10:17-18.

The three additional post-termination mailers sent out under Wells Fargo's marketing group program do not help Plaintiff's case either.  One of the letters, the initial TR letter, was mailed to customers in mid-August 2017 prior to Plaintiff's resignation on

_____

[9] To the extent that Plaintiff alleges Wells Fargo's software should have been capable of removing a particular employee's information once a largely automated mailing process has begun, Plaintiff provides no factual basis to establish she has the necessary personal knowledge to testify about what processes the software can or cannot be used, and therefore her testimony in that regard amounts to inadmissible speculation.  See Fed. Rule of Evid. 602; Burch, 433 F. Supp. 2d at 1119.  Importantly, too, even Plaintiff concedes she in fact has no knowledge concerning the specifics of Wells Fargo's mailing process or how long that process takes.  Pl.'s Dep., 184:13-20.

[10] Plaintiff claims, for example, that until she resigned, she did not see any personalized mailers that went out without her picture and personal cell phone but that this changed with the post-termination mailings.  See Pl.'s Decl. ¶ 14, 4:67-13.  In response, Wells Fargo has in fact pointed to specific mailings that went out both before and after her employment that did not contain the personal information she claimed was always present.  A FastMail direct mail letter denominated "On the House", for example, mailed on August 7, 2017, did not contain her picture, and neither did the AMC postcard mailed after her termination.  Clark Dep., 45:2-10; 46:1-49:17. Ex. 2; Pl.'s Dep., 156:18-157:22; 162:2-5, Ex. 9.  In addition, marketing mailers did not always have Plaintiff's purported personalization choices.  The TR direct mail letter, and the YHM mailer, both sent prior to her termination, included Plaintiff's picture but not her cell phone number.  UMF Nos. 12. 15; Clark Dep. Exs. 3-4.

August 25, 2017. Clark Dep. 49:23-50:12. In addition, the YHM group mailer was mailed on or about August 24, 2017, again before Plaintiff's employment with Wells Fargo ceased. Id. at 43:5-45:1. As indicated above, there is no evidence that Plaintiff ever asked that mailers, whether through the FastMail program or as initiated by the marketing group, stop before she quit working for Wells Fargo. Finally, with regard to the TR follow-up postcard, while that mailer did go out in mid-September of 2017, some three weeks after Plaintiff's resignation, Wells Fargo has adduced evidence that the process for mailing that follow-up again started on August 14, 2017, at a point in time when Plaintiff was still employed. Clark Dep., 50:22-52:3. Importantly, Plaintiff admits that she was aware of the marketing campaigns pursuant to which the three direct mailers were sent out and was notified by Wells Fargo about the details of those campaigns. Pl.'s Dep., 45:15-24; 50:16-51:16; 95:25-96:14; 96:24-97:2; 98:14-99:10; 99:25-100:8; 104:2-105:6; 148:20-152:2. Plaintiff further concedes that she never told anyone at Wells Fargo that she did not want the marketing group to send personalized mailers containing her information. Id. at 97:23-98:2.

The evidence consequently shows that each of the mailings objected to by Plaintiff was either sent, or already in the mailing process, while Plaintiff was still a Wells Fargo employee. Under those circumstances Plaintiff's consent to the mailers must be inferred. See DiGiacinto v. Ameriko-Omserv Corp., 59 Cal. App. 4th 629, 637 (1997) ("an at-will employee who continues in the employ of the employer after the employer has given notice of terms or conditions of employment has accepted such terms and conditions"). Because lack of consent is an essential element of Plaintiff's privacy claims, Plaintiff's inability to make that showing makes her claims fail as a matter of law, thereby entitling Wells Fargo to summary judgment.

///

///

///

///

**CONCLUSION**

Based on all the foregoing, the Court finds that Defendant Wells Fargo is entitled to summary adjudication as to claims remaining in this lawsuit, which allege statutory and common law invasion of privacy by way of Plaintiff's First and Second Causes of Action.  Defendant's Motion for Summary Judgment (ECF No. 9) is accordingly GRANTED, and the Clerk of Court is directed to enter judgment in favor of Wells Fargo accordingly.

IT IS SO ORDERED.

Dated:  March 16, 2020

_____
MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE